# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **MORRIS JOHNSON,** | |
| Plaintiff, | **Case No. 2:17-cv-16** |
| v. | **Judge Algenon L. Marbley** |
| **OHIO DEPARTMENT OF PUBLIC SAFETY,** | **Magistrate Judge Jolson** |
| Defendant. | |

## OPINION AND ORDER

This matter is before the Court on Defendant Ohio Department of Public Safety's ("the Department") Motion for Summary Judgment (ECF No. 27). For the reasons set forth below, the Court **GRANTS** the Motion.

## I. BACKGROUND

### A. Procedural Background

Plaintiff Morris Johnson was a Trooper with the Ohio State Highway Patrol. After he was terminated from his position, he brought suit against his former employer, the Ohio Department of Public Safety, for violations of Title VII of the Civil Rights Act of 1991. Specifically, he alleges disparate treatment on the basis of race, arguing that he, a Black Trooper, was treated less favorably than David Johnson, a similarly-situated white Trooper.[1] (ECF No. 1). On March 23, 2018, Defendant Ohio Department of Public Safety filed a Motion for Summary Judgment, seeking to dismiss his claims. (ECF No. 27). That Motion is fully briefed and is ripe for review.

---

[1] To avoid confusion between David Johnson and Morris Johnson, this Order refers to Morris Johnson as "Plaintiff" and refers to David Johnson using both his first and last name.

## B. Factual Background

Plaintiff was stationed as an Ohio State Highway Patrol Trooper in Lebanon, Ohio, in 2013. (ECF No. 17 at 73). In June 2013, he arrested a motorist, Shelley Burchett, for driving under the influence of alcohol. (*Id.* at 147). At some point during the stop, Plaintiff mentioned that there was a Waffle House nearby and told Ms. Burchett that he would take her there, noting that "[t]hey make some fantastic waffles." (*Id.* at 159). During her field sobriety test, Ms. Burchett mentioned several times that her ex-boyfriend was actually "the one who drives around drunk without a license" and that he should be arrested instead. (*Id.*)

The next month, Plaintiff once again spotted Ms. Burchett driving. It is undisputed that he pulled her over without probable cause. (*Id.* at 156-57). And what happened following the second stop is also largely undisputed. At no point during the 11-minute stop did Plaintiff radio the stop to his post, as Highway Patrol policy required him to do. (*Id.* at 155). He also admits that he told Ms. Burchett that he "liked" her and that he "apologized for not coming back and taking her to the Waffle House . . . ." (*Id.* at 157). He asked her, "If I would have come over that night[,] would you have gone to the Waffle House with me?" (ECF No. 17-1 at 82). Ms. Burchett said yes, but that she knew it would have jeopardized his job. (*Id.*). Plaintiff then joked about the impropriety of the offer, saying, "[c]ould you imagine that, me taking you to the Waffle House and it coming up in court?" (ECF No. 17 at 166-67). Ms. Burchett mentioned that she had visited the casino after Plaintiff pulled her over the first time, and Plaintiff offered to meet up with her there, noting, "if you're ever up there, just give me a call, we can play some games together." (*Id.* at 159). Plaintiff offered Ms. Burchett his personal cell phone number, and although Ms. Burchett stated that she was "dating someone," Plaintiff said that "she should take his number down just in case" and that "if she had a question or was having a bad night[,]

2

give him a 'buzz.'" (ECF No. 17-1 at 82). When Ms. Burchett said she was using her ex-husband's phone, Plaintiff stated that he would not want her to put his number in that phone, and directed her to write the number down in a secret location so others could not see it. (*Id.*).

Plaintiff's primary motivation in stopping Ms. Burchett on that second occasion is an issue of contested fact: Plaintiff claims that he initiated the stop in order to get information from Ms. Burchett as to her allegedly serially-drunk-driving ex-boyfriend's whereabouts so he "could work that particular area," (*Id.* at 151-52), but he also admitted that he wished for her friendship. (*Id.* at 195 ("Q: Were you trying to cultivate a person-to-person friendship with Mrs. Burchett? A: It was just a friend initiation, just if you're out and about, give me a call, we can play some games.")). Defendant, however, argues that he initiated the stop "in order to establish a personal relationship" with Ms. Burchett. (ECF No. 27 at 6).

A citizen later contacted the Ohio State Highway Patrol reporting the inappropriate interaction. (ECF No. 17-1 at 161-62). Sergeant Terrill Barnes was assigned to investigate the complaint. (*Id.* at 162). As part of his investigation, Sergeant Barnes twice interviewed Plaintiff, reviewed video of the stop, looked over the documentary record, and interviewed other witnesses. (*Id.* at 83-91). After the investigation, Plaintiff was found in violation of the Rules and Regulations of the Ohio State Highway Patrol, specifically of Rule 4501:2-6-02(i)(1), Conduct Unbecoming an Officer and Rule 4501:2-6-02(B)(5), Performance of Duty. (*Id.* at 118).

Plaintiff was recommended for termination. (*Id.*). The Director of Public Safety held the termination in abeyance pursuant to the terms of a Last Chance Agreement, which entailed a 10-day suspension without pay, an agreement that if Plaintiff ever engaged in similar behavior he would be terminated, an agreement that Plaintiff would waive the right to any legal proceedings

against his employer, and a recognition that if Plaintiff abided by the Last Chance Agreement for two years, it would "become void and no active record of it will remain." (*Id.* at 121-22). Plaintiff accepted the conditions of the Last Chance Agreement on December 5, 2013. In sum: all Plaintiff had to do to remain a Trooper with the Ohio State Highway Patrol was to avoid the same course of conduct for two years.

Less than two years later, on August 22, 2015, Plaintiff violated the Last Chance Agreement. He pulled over another female motorist, Crystal Stapleton-Wilson, on suspicion of operating a vehicle while intoxicated. (ECF No. 17 at 202-05). Her field sobriety test reflected indicia of intoxication, including slow body movements, red and glassy eyes, and a scent of alcohol. (*Id.*). He read her *Miranda* rights, placed her under arrest, put her in handcuffs, and searched her before taking her to the Franklin police station. (*Id.* at 205).

Although Ms. Stapleton-Wilson had texted a contact to give her a ride home, Plaintiff offered to take her himself. (*Id.* at 207-08). He did so, and, in violation of Ohio State Highway Patrol Policy, failed to turn on his in-car camera on the ride home. (*Id.* at 208-09). Plaintiff claimed that he did not turn on the car camera because "it didn't dawn on [his] mind at the time" and "she wasn't giving [him] any issues at the police station." (*Id.*). Yet, throughout the drive home, Plaintiff admitted that Ms. Stapleton-Wilson continued to behave as though she was intoxicated, noting that she was "a typical drunk talking." (*Id.*). She also evidently repeatedly expressed concerns about her vehicle being towed. (*Id.*). So, at some point on the ride, Plaintiff indicated he would go back out to her car and put a note on the vehicle indicating that she would pick it up the next day. (*Id.* at 216). They eventually pulled into her driveway, she left the vehicle, and Plaintiff radioed his station indicating that he had left the scene. (*Id.* at 215-16).

4

Plaintiff did not, in fact, leave the scene. He ended up staying at her residence for 32 more minutes after he reported he left, from 4:55 a.m. to 5:27 a.m. (*Id.* at 215-16, 224). Because the in-car camera was not turned on, the Court has little information as to the content of the conversation that transpired between the two. (*Id.*). But the record reflects that Plaintiff later texted Ms. Stapleton-Wilson from his personal cell phone. (ECF No. 17-1 at 153). The entirety of the conversation is as follows:

> Plaintiff: Yo yo
>
> Ms. Stapelton-Wilson: Who is this? Lol I don't recognize this number
>
> Plaintiff: Me the person you hate
>
> Ms. Stapelton-Wilson: Ha ha! Hate?
>
> Plaintiff: Put note on your van. Get some rest.

Lebanon Post Commander Matt Hamilton learned of the incident through a reporting citizen, and he assigned Sergeant Investigator Robert Hayslip to investigate the allegation. (ECF No. 17-1 at 151). Sergeant Hayslip reviewed the video of the stop, interviewed witnesses including Plaintiff and Ms. Stapleton-Wilson, and concluded that Plaintiff violated his Last Chance Agreement by attempting to cultivate a personal relationship with a female arrestee in violation of Rule 4501:2-6-02(I)(l)(3), Conduct Unbecoming an Officer. (*Id.* at 205). Major Richard Fambro and Lieutenant Colonel George Williams recommended that his employment be terminated; Assistant Director Montgomery agreed. Plaintiff was fired on December 4, 2015. (*Id.* at 213).

Plaintiff sought redress through his union, the Ohio State Troopers Association. (ECF No. 17 at 263). An arbitrator found just cause to support Plaintiff's termination. (ECF No. 18-1 at 15).

Plaintiff then sought and received a right-to-sue letter from the Equal Employment Opportunity Commission. (ECF No. 1-2). He filed suit in this Court on January 9, 2017. (ECF No. 1).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## III. LAW AND ANALYSIS

### A. The *McDonnell-Douglas* Framework

Plaintiff alleges that, in terminating his employment, the Ohio Department of Public Safety unlawfully discriminated against him based on his race. Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e–2(a). Plaintiff does not advance direct evidence of discrimination, but instead seeks to prove his claims under the burden-shifting framework of *McDonnell-Douglas*, 411 U.S. 792 (1973). Under that framework, Plaintiff must first establish a *prima facie* case of racial discrimination by showing: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)). The purpose of the prima facie stage of the burden-shifting framework is to:

> eliminate . . .the most common nondiscriminatory reasons for the plaintiff's [termination]. . . . . [T]he prima facie case raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee.

*Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal citations and quotation marks omitted). The Sixth Circuit has admonished that the plaintiff's burden "at the prima facie stage is 'not onerous' and 'poses a burden easily met.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)).

If Plaintiff is able to establish a prima facie case, the burden of production shifts to the Defendants to offer a legitimate, nondiscriminatory reason for the adverse action. *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572 (6th Cir. 2000). Finally, the burden shifts to Plaintiff to show that the articulated reasons are pretextual by showing that the reasons: "(1) have no basis in fact; (2) did not actually motivate the actions; or (3) were insufficient to warrant the actions." *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994).

### B. Plaintiff Has Not Established a Prima Facie Case of Racial Discrimination

Here, Plaintiff fails to clear even the low hurdle of establishing a prima facie case of racial discrimination. The Ohio Department of Public Safety concedes that Plaintiff is a member of a protected group, was otherwise qualified for a Trooper position, and that an adverse action was taken against him. (ECF No. 27 at 13). But it argues that the circumstances cannot support an inference of discrimination because neither does Plaintiff allege that he was replaced by a person outside of his protected class, nor does the record establish that similarly-situated non-protected employees were treated more favorably. *See Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004).

In an effort to prove that the Defendant terminated him because of his race, Plaintiff argues that another Trooper—David Johnson, a white male—received better treatment than he received. In short: this case rises and falls on whether David Johnson was similarly-situated to Morris Johnson in all relevant respects, as a Title VII comparator must be. *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 768 (6th Cir. 2004) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 2012)). In *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir.1992), the Sixth Circuit articulated three factors relevant to determining whether employees are "similarly situated" in the context of cases alleging differential disciplinary action:

> to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have (1) dealt with the same supervisor, (2) have been subject to the same standards and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.* at 583; *see also Johnson v. Kroger Co.,* 319 F.3d 858, 867 (6th Cir.2003) ("the weight to be given to each [*Mitchell*] factor can vary depending upon the particular case"); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998) (observing that

the *Mitchell* factors "generally are all relevant considerations in cases alleging differential disciplinary action").

A review of the record reveals that Plaintiff and David Johnson were not similarly-situated in a number of key ways.

The Court begins with a review of David Johnson's infractions: In October 2013, David Johnson's Lieutenant Post Commander received a complaint that David Johnson had "initiated requests through social media, such as Facebook, to befriend citizens whom [he had] encountered during traffic stops." (ECF No. 22 at 25-26). Lieutenant Post Commander Conley was unable to substantiate that allegation, so he advised David Johnson that any future violations may result in disciplinary action. (*Id.*). Almost three years later, in March 2016, David Johnson pulled over a motorist, Kimberly Edwards, for speeding. He spoke to her for almost 13 minutes after he issued her the citation, including about her family business and about NASCAR. (*Id.* at 56). He also told her that she looked like Heather Thomas, star of the 1980s television program, *The Fall Guy*.[2] (*Id.*). He later contacted Ms. Edwards on Facebook Messenger, saying that he was actually thinking of a different actress that bore a similarity to Ms. Edwards, and sent her a Facebook friend request. (*Id.*). Ms. Edwards reported the conduct, and Sergeant Investigator Terrill Barnes was assigned to investigate the complaint. (*Id.*). Major Richard Fambro and Lieutenant Colonel George Williams recommended that David Johnson be suspended for one day; Assistant Director Montgomery agreed. (*Id.*).

The following key dissimilarities preclude David Johnson from being a similarly-situated comparator to Plaintiff: First, and perhaps most saliently, David Johnson was not subject to a Last Chance Agreement. The existence of the Last Chance Agreement is a crucial distinction

---

[2] *See* Heather Thomas, IMDB, https://www.imdb.com/name/nm0001793/ (last visited Oct. 22, 2018).

because it demonstrates that Plaintiff was on clear notice that further violations would result in possible termination and that Plaintiff voluntarily waived any right to legal proceedings against his employer as to the initial infraction.[3] Moreover, it was a contract, negotiated at arm's length, that vested each party with certain rights: in consideration for the termination being held in abeyance, Plaintiff agreed that if he violated either Rule 4501:2-6-02(I)(3), Conduct Unbecoming an Officer, or Rule 4501:2-6-02(B)(5), Performance of Duty, within two years of signing the date of the agreement he "*will* be terminated." (ECF No. 17-1 at 145 (emphasis added)). David Johnson was subject to no such agreement, and therefore was not "subject to the same standards" as is necessary to be a relevant comparator. *See Mitchell v. Toledo Hosp.,* 964 F.2d 577. 583 (6th Cir.1992).

Plaintiff identifies two points at which he believes procedural iniquities arose: First, he argues that the investigation of the first alleged Facebook friending incident was insufficient. But Commander Conley testified that he tried to investigate, but was unable to make contact with any alleged victims: "We couldn't get a hold of anybody; no one would call us back. It was an unsubstantiated complaint." (ECF No. 19 at 19). He later continued: "I couldn't confirm or deny that it even occurred. And without being able to have any other further information, there was no other recourse than to tell him if it did happen, don't do it again." (*Id.* at 25). He later reiterated the point: "We couldn't determine if it was a traffic stop made, we couldn't determine if [David Johnson] knew this guy or girl, or whoever it was, at the time off duty, if he hadn't come across her at Walmart off duty, on his own time. There was no information." (*Id.* at 34). The Court sees no reason to disbelieve Commander Conley on this subject, and there is no

---

[3] It is true, of course, that "an employee may not prospectively waive his or her rights under . . . Title VII." *Hamilton v. General Elec. Co.*, 556 F.3d 428 (6th Cir. 2009). Here, the existence of the Last Chance Agreement does not preclude Plaintiff from asserting his rights under Title VII in this forum or any other. Its existence does, however, shed light on the dissimilar positions of Plaintiff and David Johnson.

evidence to suggest that Commander Conley left major stones unturned. Additionally, as discussed at length below, there is a difference in the severity of the allegations against Plaintiff and against David Johnson. It is this factual distinction underlying the allegations that differentiates this case from *Ross v. City of Dublin*, in which this Court determined that a Plaintiff had established a prima facie case of racial discrimination where his white comparator faced a much less comprehensive investigation for the exact same alleged misconduct (there, violation of a policy that prohibited City employees from using City vehicles for personal use). (No. 2:14-cv-2724; ECF No. 39).

Second, he argues that there is a genuine issue of material fact as to whether David Johnson should have received more severe discipline after the second Facebook friending incident because he had effectively been "warned" by Commander Conley after the first incident. The Interoffice Memorandum that Commander Conley sent to David Johnson after he investigated the first allegation read as follows: "It has been brought to my attention that you have initiated requests through social media, such as Facebook, to befriend citizens whom you have encountered during traffic stops. These attempts have the appearance of impropriety and reflect negatively on the Highway Patrol. Any future instance of this conduct is prohibited and reoccurrence may result in disciplinary action." (ECF No. 22-1). This warning is not comparable to the Last Chance Agreement for a number of reasons: First, it was issued after unsubstantiated conduct. Second, it does not prescribe a disciplinary measure for a subsequent infraction: whereas the Last Chance Agreement provides that "[if] the Employee violates Rule 4501:2-6-02(I)(3) Conduct Unbecoming an Officer, the Employee *will be terminated*" (ECF No. 17-1 at 145 (emphasis added), this warning uses "may" to connote a future possibility. Nor does it explicitly bind the parties, as the Last Chance Agreement did. In short, the informal warning

David Johnson received and the Last Chance Agreement under which Plaintiff operated are such different beasts that they provide no basis to conclude that the two Troopers should have received similar discipline on the second alleged infraction.

Moreover, in order to demonstrate that the two Troopers' actions are comparable, Plaintiff must demonstrate that the incidents were of "comparable seriousness." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 778 (6th Cir. 2016) (quoting *Mitchell*, 964 F.2d at 583). The conduct David Johnson engaged in, while highly inappropriate and inarguably corrosive of the trust the public affords to law enforcement officers, was not nearly as severe as Plaintiff's, in large part because Plaintiff's infractions occurred while he was on duty, while the women he spoke to were detained, and while he carried with him all of the accoutrements of state power and its accompanying capacity for violence: a badge, a patrol car, handcuffs, and a gun. A person detained is a person coerced. This principle animated the Supreme Court's decision in *Miranda* when it recognized that the Fifth Amendment privilege protected individuals from self-incrimination "in all setting in which their freedom of action is curtailed in any significant way" because "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel [her] to speak where [she] would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). This is not only true of detentions in which a law enforcement officer seeks to extract incriminating information from a detained person; it is also true when a law enforcement officer seeks to extract personal favor, such as friendship or romance, from a detained person. To put it succinctly: these interactions are not consensual. And that concern is only amplified when the detained person is also intoxicated, as were the women in Plaintiff's case.

Of course, to send a Facebook friend request to a previously-detained woman is grossly at odds with the professed mission of the Ohio State Highway Patrol to "protect life and property, promote traffic safety and provide professional public safety services with respect, compassion, and unbiased professionalism."[4] But David Johnson's romantic overture to Ms. Edwards was not comparable in the sense that his on-duty behavior was limited to comparing her to an attractive actress. It goes without saying that the comparison alone may have been uncomfortable for Ms. Edwards: absolutely nothing suggests she invited an officer of the state to comment on her appearance. But the behavior for which he was actually disciplined – the Facebook friending – took place when David Johnson was off-duty. Thus, David Johnson's conduct lacks some of the hallmarks of coercion that are so troubling in Plaintiff's case. To wit, Plaintiff attempted to consort with two women while he was actively on duty and while they were not free to leave his presence. In one case, he offered to take a detained woman to a Waffle House – a woman whom he suspected of being so intoxicated that she could not lawfully operate a vehicle. He stopped her again without probable cause, offered to take her to a restaurant and to meet up with her at a casino, and gave her his personal number, asking her to conceal it from her ex-husband and others. In another, he stopped a woman who was, again, so intoxicated that she could not operate a vehicle, handcuffed her, took her to her house despite the fact that she had contacted another person to pick her up, lingered for at least 30 minutes, and then texted her from his personal phone, in violation of State Highway Patrol policy, in a manner that was, at best, indecorous.

Against this backdrop, it was eminently reasonable for the State to treat Plaintiff's actions with the gravity they deserved: he was afforded one last chance, he agreed that if he violated the

---

[4] Our Mission, OHIO STATE HIGHWAY PATROL, https://www.statepatrol.ohio.gov/about.aspx (last visited October 23, 2018).

13

Last Chance Agreement he would be terminated, he violated the agreement, and he was terminated. Plaintiff cannot establish areasonable inference of discriminatory motive because he was treated more severely than David Johnson based on "more egregious circumstances." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 612 (6th Cir.2002).

To be sure, David Johnson's record – other than the two Facebook incidents, one of which was verified and the other was not – was far from spotless: he also had previously been disciplined for unprofessional behavior, including a 3-day suspension in 2012 after he failed to administer aid to a female passenger suffering from cardiac arrest in a car that he pulled over, and a 2014 incident in which he improperly detained an individual without a search warrant and was issued a written reprimand. (ECF No. 24). But these infractions are not analogous to Plaintiff's. Because this conduct is not substantially identical in "all of the relevant aspects" it is not evidence the Court may use in comparing disciplinary measures. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Moreover, it is evidently the policy of the Ohio State Highway Patrol that discipline only stays on a Trooper's record for two years, and pursuant to the Trooper collective bargaining agreement, the Department of Public Safety may not consider behavior that is not reflected in a Trooper's record. Thus, the Department would not have considered incidents that occurred before March 2014 in fashioning sanctions against David Johnson.

Finally, *Mitchell* advises that to be deemed "similarly-situated," comparator individuals must have "dealt with the same supervisor." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Subsequent case law in the Sixth Circuit clarified that the "same supervisor" requirement "does not automatically apply in every employment discrimination case," *Bobo v. United Parcel Serv., Inc.*, 655 F.3d 741, 751 (quoting *McMillan v. Castro*, 405 F.3d 405, 414

(6th Cir. 2005), and that it is not an "inflexible requirement." *Id.* (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 479-80 (6th Cir. 2003)). Here, it informs the Court's analysis that Plaintiff and David Johnson never had the same direct supervisor because it is relevant to the ultimate question – namely whether "the plaintiff was the victim of intentional discrimination." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). Plaintiff argues that David Johnson is a relevant comparator despite this dissimilarity because his initial incident was investigated by Terrill Barnes and resulted, through Director Montgomery's ratification, in a Last Chance Agreement, whereas David Johnson's second infraction was investigated by Terrill Barnes and resulted, through Director Montgomery's ratification, in a one-day suspension. But this argument is unavailing, for the reasons addressed above: the quantum of misbehavior is radically different, so one would naturally expect a radically different disciplinary outcome. Here, because the Troopers dealt with different supervisors, were subject to different standards, and engaged in conduct with differing levels of egregiousness, no rational jury could determine that the two Troopers were similarly-situated for the purposes of the *McDonnell-Douglas* framework. S*ee Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004).

## IV.    CONCLUSION

The Court **GRANTS** the Motion for Summary Judgment (ECF No. 27). This case is hereby **DISMISSED**.

**IT IS SO ORDERED.**

       s/Algenon L. Marbley
       **ALGENON L. MARBLEY**
       **UNITED STATES DISTRICT JUDGE**

**DATED:   November 9, 2018**